IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:18-cr-136-PLR-DCP |
| ) | |
| BRADLEY PAYTON HEFNER, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Bradley Payton Hefner's Motion to Suppress [Doc. 32], filed on January 2, 2019. The Government filed a response in opposition to the motion [Doc. 35]. An evidentiary hearing on the motion was held on January 18, 2019. Assistant United States Attorney Brent N. Jones was present representing the Government. Attorney Mark E. Brown was present representing Defendant Hefner, who was also present. At the conclusion of the hearing, the Court took the suppression motion and related filing under advisement.

**I. POSITION OF THE PARTIES**

Defendant seeks to suppress all evidence, including a black and silver Taurus 9 millimeter handgun, seized as a result of a warrantless search of the vehicle in which he was sitting on July 8, 2018. Defendant argues that the law enforcement officer lacked a reasonable suspicion of criminal activity, which caused the initial contact to turn into an unconstitutional search and

seizure, and unreasonably extended the initial contact to deploy a drug detection dog to establish probable cause. Defendant further argues that the officer engaged in unconstitutional profiling.

The Government asserts that the stop to check on the well-being of the driver, followed by a detention to investigate criminal activity, was reasonable. Further, the Government maintains that due to the information the law enforcement officer knew at the time of the stop, a valid warrantless search of the vehicle was conducted based upon probable cause. Finally, the Government argues that while the officer had probable cause to search for weapons and drugs based on multiple factors, the officer had additional justification once the drug detection dog alerted positively on the vehicle within minutes of the initial stop.

## II. FACTUAL BACKGROUND

During the evidentiary hearing, the government presented the testimony of Deputy Thomas Cowden ("Cowden") of the Sevier County Sheriff's Department. Defendant presented no witnesses. The following facts are taken from the testimony at the suppression hearing as well as a bodycam video recording made at the time of the stop.[1]

Cowden has been a law enforcement officer for approximately eight years, and a K-9 officer for the past four years. On July 8, 2018, Cowden was engaged in his regular patrol duties. At approximately 2:00 a.m., Cowden was traveling south on Chapman Highway when he observed "roughly about a quarter mile away" a set of headlights facing west to east across the highway. Cowden testified that as he was approaching, the vehicle had ample time to advance out of the parking lot and onto the highway but did not do so. Cowden pulled into the parking lot to check

---

[1] The bodycam video appears to be a recording from the officer assisting Cowden, who was not identified at the suppression hearing.

on the person in the vehicle, as well as the business located on the property[2], which was closed during that time of the night. Cowden testified that there had been "numerous amounts of drug activity going on in that area."

Cowden explained that he initially pulled into the parking lot to determine whether the vehicle occupant was alright or whether the vehicle had broken down, and generally to see if his assistance was needed. While he did not recognize the vehicle, Cowden stated that as he approached the vehicle at a T-bone angle, his headlights shined on the driver side window, and he immediately recognized Defendant Hefner. Defendant was holding an object out the window with his left hand. As he got closer, Cowden was able to determine that the object was a flashlight, which was not turned on. Cowden initiated a radio call requesting an officer to come and back him up. He testified that the nature of the stop changed at that point. Cowden explained that he had many dealings with Defendant over the years with complaints of violent crimes and drug activities. Specifically, Cowden noted the most recent incident involved a female alleging that she had been picked up by Defendant, who represented himself to be a bond agent. She claimed that Defendant put a gun to her head, forced her to take meth, and "did several sexual things to her." Cowden further testified that he has worked domestic calls involving Defendant "where victims have stated he was violent on several occasions." Additionally, Cowden stated that a couple of years ago, he was involved in a call that resulted in the removal of a shotgun and pistol from Defendant's residence. Cowden testified that he and other officers choose not to approach Defendant alone because "it always plays out with a weapon."

---

[2] The business was a gas station—Floyd's Market, located at 1221 Chapman Highway, Seymour, Tennessee.

3

When he walked up to the car, Cowden inquired about Defendant's reason for being in the parking lot. Defendant responded that he was waiting on Tabitha Gibbs ("Gibbs") to come from the residence across the highway. Cowden noted that the residence which Defendant referenced was "well known" to him. Cowden explained that he knew Gibbs had "been in our system numerous times, too, for drug activities," and that there was a warrant out for her arrest. Upon ascertaining this information, Cowden began to suspect drug activity.

At that point and for his safety, Cowden asked Defendant to step out of the vehicle, lift up his shirt, and turn in a circle to make sure he did not have a weapon. Defendant complied, and Cowden observed a "gun holster" on Defendant's right hip, which Cowden described as being small and black with a "slit enough for the barrel to go down." Cowden questioned Defendant concerning the whereabouts of a weapon, and Defendant maintained that the holster was for a flashlight. The video recording revealed that Defendant was asked whether he had "weapons or anything on him," and Defendant responded "no." Defendant was then asked whether he had a knife in his pocket, and Defendant replied "yes," and handed it over to the officer. Cowden asked Defendant for consent to search the vehicle, and Defendant refused. Cowden testified that he always asks for consent to search before deploying his canine. Cowden then ran his canine around Defendant's vehicle, and it alerted on the passenger side of the vehicle. This all occurred within two minutes of when Cowden pulled into the parking lot.

Cowden testified that he always patrols with his canine named "Cross," and has handled Cross for four years. Cross is trained to detect marijuana, methamphetamine, cocaine, ecstasy and heroine. Cross alerts by exhibiting a change in behavior—sitting. Because Cross is the only dog on duty at night during a twelve-hour shift, Cowden stated that he "gets used quite a bit." Cowden

4

is on duty with Cross fourteen days a month, and Cowden estimated that Cross is used at least seventy percent of the time and sometimes on multiple occasions in one night.

After Cross alerted on the passenger side of Defendant's vehicle, Cowden then performed a search of the vehicle. He discovered two small burnt roaches, which appeared to be marijuana, in the front ashtray between the two seats. He also found a black and silver Taurus 9 millimeter pistol ("the firearm") in the flip down console of the back seat. The firearm was loaded with one bullet in the chamber and fifteen in the magazine.

At that point, Cowden handcuffed Defendant. When Gibbs arrived on the scene, she was placed under arrest on her outstanding warrant. Cowden believed Defendant to be a convicted felon, because he had requested that dispatch run a criminal history of Defendant and was advised that Defendant had pleaded guilty to second degree burglary in South Dakota. During the exchange, Defendant stated that "he wasn't a felon anymore" and "had paperwork, but it wasn't with him."

### III. ANALYSIS

The cornerstone of Defendant's argument is the Fourth Amendment, which prohibits unreasonable searches and seizures. U.S. Const. amend. IV. The Court conducts a dual inquiry to evaluate the reasonableness of an investigative stop: 1) "whether the officer's action was justified at its inception," and 2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20 (1968). The propriety of the intrusion is judged by examining the reasonableness of the officers' conduct and their suspicions in light of the surrounding circumstances. *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (citing *United States v. Luqman,* 522 F.3d 618 at 616–17 (6th Cir. 2008).

The analysis of whether an investigatory stop is lawful must be based on an examination of the totality of the circumstances to "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez,* 440 F.3d 363, 371 (6th Cir. 2006) (internal citation and quotation marks omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce,* 531 F.3d 374, 380 (6th Cir. 2008) (internal citation and quotation marks omitted). "Pertinent circumstances include the officer's direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Campbell*, 549 F.3d at 371 (citing *Pearce,* 531 F.3d at 383; *Dorsey v. Barber,* 517 F.3d 389, 395 (6th Cir. 2008)). "[W]hile an 'individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime,' police 'officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Pearce,* 531 F.3d at 383 (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000)).

### A. Probable Cause to Stop and Investigate

Defendant first challenges the purpose of the initial stop, arguing that Cowden had no reasonable, articulable suspicion of criminal activity. The Court disagrees.

Cowden articulated the circumstances of the initial stop, stating that he first noticed Defendant's vehicle when he was patrolling Chapman Highway at 2:00 a.m. The vehicle was stopped, facing the highway with the headlights illuminated, in the parking lot of a business, which was closed for the evening. This occurred in an area known for high drug activity. When the

6

vehicle failed to enter onto the highway, after having had ample time to do so, Cowden determined that he should check on the status of the vehicle's occupant and offer assistance, if necessary, as well as check on the business property. "No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions." *United States v. Brown*, 447 F. App'x 706, 710 (6th Cir. 2012) (unpubl'd).

As Cowden pulled into the parking lot, Defendant responded by holding an object out the window with his left hand, which was later determined to be a flashlight. When Cowden's headlights shined on the driver side window, he immediately recognized Defendant, who was well-known to Cowden. Cowden had multiple dealings with Defendant over the past years with complaints of violent crimes and drug activities. Upon recognizing Defendant, Cowden called for a backup officer, stating that he, along with other officers, chooses not to approach Defendant alone because "it always plays out with a weapon."

Defendant argues that sitting in car with a flashlight in an area where there had been complaints of drug activity is insufficient to create reasonable suspicion of criminal activity. While a person's presence late at night in a high-crime area "may not, without more, give rise to reasonable suspicion," *see United States v. Caruthers,* 458 F.3d 459, 467 (6th Cir. 2006), here, there was more. First, Defendant was sitting in a car with the headlights shining across Chapman Highway. It was 2:00 a.m., and Defendant was stopped in the parking lot of a business that was closed for the evening in an area known for high drug activity. Moreover, as Cowden pulled into the parking lot to perform check on the vehicle's occupant, Defendant responded by holding an object out the window in his left hand. These circumstances establish relevant contextual considerations in a *Terry* analysis.

7

"The most frequently recurring factors utilized in the Sixth Circuit's analysis [of whether the officer had reasonable suspicion] include: (1) nervous/evasive behavior, (2) furtive movements made in response to police presence, (3) the speed of a suspect's movements, (4) presence in a high-crime area, and (5) the time of day." *United States v. Williams*, 804 F. Supp. 2d 659, 662 (M.D. Tenn. 2011) (citing *United States v. Brock,* No. 07–20400–STA, 2008 WL 4279623, at *3 (W.D. Tenn. Sept. 12, 2008))*; see also Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) (finding "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations," as well as that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion") (internal citations and quotations omitted); *United States v. See,* 574 F.3d 309, 314 (6th Cir. 2009) (holding that without being independently dispositive, the time of day is a relevant consideration). In this case, not only was Defendant present in a high crime area in the middle of the night, but also, he exhibited a peculiar response as Cowden approached by holding an object out of the driver's window. Based on these attendant circumstances, along with Cowden's prior knowledge of the Defendant's past violent criminal activity and penchant to go armed, the Court finds that there were sufficient contextual factors to support Cowden's reasonable suspicion for effectuating the initial stop.

Next, Defendant asserts that Cowden unreasonably extended the initial contact with Defendant and turned it into an unconstitutional search and seizure. Defendant argues that he "had only a flashlight and told Cowden he was waiting on Tabitha Gibbs," but once Cowden heard that Defendant was waiting on Gibbs, "he immediately ordered Hefner out of the car and began his search for a gun." [Doc. 32 at 6].

The Court initially observes that the above assertion is not an accurate description of the sequence of events. Cowden testified that his search of the vehicle, which resulted in the discovery

of the firearm, occurred after Cross had alerted on the vehicle. The Court further observes that between the time Cowden first pulled in to the parking lot to conduct a welfare check and when he later deployed Cross, several pertinent happenings occurred. First, as Cowden pulled up to Defendant's vehicle and his headlights shone on the driver's window, Cowden immediately recognized Defendant from past encounters and was aware of his history of violent crimes and firearms. This recognition was coupled with Cowden's observation that Defendant was holding an object out the driver's window. Due to safety concerns, Cowden called for a back-up officer to assist him. At some point thereafter, Cowden ascertained that the object was a flashlight, and he approached Defendant to ask the reason for him being in the parking lot. Defendant responded that he was waiting on Gibbs to come from the residence across the highway. Gibbs was known to Cowden as having a criminal history of drug activities, and Gibbs had an active arrest warrant.

Cowden testified that he was suspicious of drug activity at that point. Cowden asked Defendant to step out of the car, pull up his shirt, and do a 360 degree turn to see if he had any weapons on him. Cowden observed a holster on Defendant's right hip, and while Defendant maintained that the holster was for the flashlight, Cowden described it as a gun holster with a slit sufficient for a gun barrel. Cowden asked Defendant for permission to search the vehicle, which was denied, so Cowden then deployed Cross.

Defendant argues that waiting in the parking lot for Gibbs with a flashlight is innocent behavior insufficient to create reasonable suspicion. Further, Defendant asserts that Cowden's knowledge of Defendant's drug history caused him to "profile" Defendant as a drug dealer, which was the basis of his suspicion for the *Terry* stop. While there may have been an innocent explanation for Defendant's activity, and while Defendant's criminal drug history alone may not be a cause for reasonable suspicion, none of these factors can be considered in isolation. *United*

9

*States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (holding that even if each specific fact relied upon by the authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is "based upon an assessment of *all* circumstances surrounding the actions of a suspected wrongdoer[,]" including those facts that would arouse suspicion only in someone experienced in law enforcement matters) (quoting *United States v. Knox,* 839 F.2d 285, 290 (6th Cir. 1988), *cert. denied,* 490 U.S. 1019(1989)). Moreover, courts and law enforcement officers are required to look beyond the possibility of innocent behavior to determine whether the facts support a reasonable suspicion of criminality. *Hoover v. Walsh*, 682 F.3d 481, 496 (6th Cir. 2012) (citing *United States v. Arvizu,* 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists[ ] . . . need not rule out the possibility of innocent conduct.")).

Here, the Court concludes that, under the facts of this case, Cowden's suspicion of criminality was reasonable, justifying an investigatory detention. As stated previously, Defendant was parked in an area of high drug activity in the middle of the night. He was known to have a criminal history of violent crimes and drug activity, which was considered by Cowden in addition to other factors supporting his suspicion. Defendant stated that he was waiting on Gibbs, who had a known criminal history of drug activities as well as an active warrant. As Cowden approached the vehicle, Defendant held a flashlight out of the driver's window. Further, upon inspection, Defendant was discovered to have a holster under his shirt on his right hip, which Cowden observed could hold the barrel of a gun. Finally, Cowden deployed the drug detection dog, which alerted on the Defendant's car. While a vehicle in a business parking lot at midday in an area with no particular criminal activity might be unremarkable, and a criminal history of drug activity alone may be insufficient to cause suspicion, in the instant case, these factors exist in a different context

10

(at night in a high-crime area) and in combination with other significant facts. In considering the totality of the circumstances, including the information that Cowden had at the time coupled with the facts as they developed, the Court concludes that the factors support a reasonable suspicion of criminality in this instance.

### B. Use of Drug Detection Dog

The Court finds that Cowden deployed Cross, the drug detection dog, within two minutes of pulling into the parking lot and initiating the stop. Defendant asserts that because Cowden's reason for the initial contact was for a well-being check, Cowden has "no reason to continue the detention of the Defendant Hefner for the purpose of deploying a K-9 unit to provide probable cause for a search of the vehicle." [Doc. 32 at 7]. Defendant maintains that once Cowden inquired about what Defendant was doing, the well-being check was complete, and there was no justification to proceed with the investigation and to deploy Cross. In support of his argument, Defendant cites to *Rodriguez v. United States,* 135 S. Ct. 1609 (2015).

Contrary to Defendant's assertions, the Court finds that *Rodriguez* does not support Defendant's position. In *Rodriguez*, the Court held that police may not extend an otherwise-completed traffic stop to conduct a dog sniff, absent reasonable suspicion. *Id.* at 1614. As detailed above, the stop was not "otherwise-completed" after Cowden's inquiry of Defendant. *See id.* Defendant's answer that he was waiting on Gibbs did not end the stop, but rather changed the nature of the stop. This information ascertained from Defendant, coupled with other factors considered by Cowden, including observing the gun holster, caused reasonable suspicion to investigate drug and gun-related activity. The Court in *Rodriquez* did instruct that when reviewing the legality of a dog sniff conducted in relation to a traffic stop, the critical question is not whether the dog sniff occurred before or after the officer issued a ticket, but whether conducting the sniff

11

prolonged, or added time to, the stop. *Id.* at 1616. The Court concludes that in this case, the dog sniff, which occurred within two minutes of the initial stop and before Gibbs arrived on the scene, did not prolong the stop beyond its conclusion. Instead, at the time that Cowden deployed Cross, he was still investigating his suspicion that drug activity was afoot. Thus, the duration of the overall stop was justified under reasonable suspicion given the totality of the circumstances.

Accordingly, I **FIND** the Government has met its burden to establish reasonable suspicion for both the initiation and scope of the stop, and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

### IV. CONCLUSION

For the reasons stated above, I **RECOMMEND**[3] that Defendant's motion to suppress [Doc. 32] be **DENIED** in its entirety.

ENTER:

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).