UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | NO. 3:18-CR-136 |
| | ) | REEVES/POPLIN |
| BRADLEY PAYTON HEFNER | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## **MEMORANDUM and ORDER**

Defendant, Bradley Hefner, objects to Magistrate Judge Poplin's Report and Recommendation [D. 43], which recommends that Mr. Hefner's motion to suppress [D. 32] be denied. For the following reasons, Mr. Hefner's objection [D. 46] is **OVERRULED**, the Report and Recommendation is **ACCEPTED IN WHOLE**, and the motion to suppress is **DENIED**.

### I. PROCEDURAL BACKGROUND

Mr. Hefner was indicted on August 21, 2018, for one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) [D. 3]. This motion was filed on January 2, 2019, but a superseding indictment was filed on February 20, 2019 [D. 41]. The superseding indictment charges Mr. Hefner on one count under § 922(g)(1), and on another count, for willfully receiving a firearm while under indictment for a felony, in violation of 18 U.S.C. § 922(n) [*Id.*].

The charged conduct for both counts occurred on or about July 8, 2018, and for that reason, Mr. Hefner has moved to adopt this motion so that it applies to the superseding indictment [D. 49]. The Government does not object [D. 53]. The Court sees no reason to object either, and will thus apply the motion to suppress to both counts of the superseding indictment.

Judge Poplin held a hearing regarding this motion on January 18, 2019 [D. 37], and promptly filed the Report and Recommendation [D. 43]. Mr. Hefner raised his objection in a timely

1

manner, and the issue is now ripe for decision. The standard of review is de novo. 28 U.S.C. § 636(b)(1)(B); FED. R. CRIM. P. 59(b)(2).

## II. FACTUAL BACKGROUND

The issue here, in a nutshell, is whether the firearm Mr. Hefner is charged with possessing and receiving was lawfully seized by Sevier County sheriff's deputies, in the early morning hours of July 8, 2018. The evidence the Court has to consider is the testimony of Deputy Thomas Cowden from the January 18 hearing, and a clip of body camera footage from another officer at the scene, which was marked as Exhibit 1 at the same hearing [D. 54].[1]

Deputy Cowden is a canine officer with Sevier County, and he was on patrol the morning of July 8 with his drug-sniffing dog, Cross. Shortly before 2 AM in the morning, Deputy Cowden was travelling south on Chapman Highway, a main thoroughfare. As he neared Floyd's Market—located in an area known for high drug activity—Deputy Cowden saw a car with its headlights on, appearing to pull out on to the highway. The car had "all the time in the world" to drive on to the highway, but it did not, and this fact piqued Deputy Cowden's curiosity [D. 54, p. 6, ll. 4-10].

He pulled into Floyd's, which was closed at the time, with the best of intentions: "I was going to see, you know, if they was all right, broke down, if there was something that I need to do" [*Id.*, p. 7, ll. 7-9]. He did not recognize the car, but he immediately recognized the driver—Bradley Hefner. The two men had "many dealings" over the years, and Deputy Cowden had responded to domestic violence calls where Mr. Hefner was the alleged assailant[2]. (Indeed, in the body camera video, Mr. Hefner appears to be on a first-name basis with both Deputy Cowden and

---

[1] For ease of reading, the Court will not cite to the record unless a specific citation is warranted.
[2] Some of that history is discussed in a previous Order, denying Mr. Hefner's motion to revoke Judge Poplin's Order of Detention [D. 40].

the other officers at the scene.) Deputy Cowden testified that once he recognized Mr. Hefner, the purpose of the stop changed, and he immediately called for backup [*Id.*, p. 7, ll. 16-21].

Deputy Cowden pulled in and parked. As he approached the car on foot, he saw Mr. Hefner holding a flashlight out the window with his left hand. He asked Mr. Hefner what he was doing in the parking lot. Mr. Hefner said he was waiting on Tabitha Gibbs to come across the street. Deputy Cowden also knew Ms. Gibbs, who had "been in the system" numerous times for drug activity, and Ms. Gibbs's father lived at the residence across the street, which was "well-known" to Deputy Cowden [*Id.*, pp. 8, 10]. At this point, Deputy Cowden testified he began to suspect Mr. Hefner of engaging in drug activity.

He asked Mr. Hefner to step out of the car, lift up his shirt, and turn around, to make sure he did not have a visible weapon.[3] Mr. Hefner had no weapon, but he did have a gun holster on the right side of his hip. When asked about the holster, Mr. Hefner said it was for his flashlight. Deputy Cowden asked for consent to search the vehicle, but Mr. Hefner refused.

The two men then have the following exchange:[4]

> Deputy Cowden: I'm going to get my dog out of my car. And we'll see.
> Mr. Hefner: Hey listen, man, there ain't nothing in my car.
> Cowden: It don't matter.
> Hefner: Hey, hey, what am I being stopped for right now?
> Cowden: Actually, right now, you're a suspicious vehicle sitting in a closed business.

At this point, Deputy Cowden goes to retrieve Cross, who is trained to detect marijuana, methamphetamine, cocaine, ecstasy, and heroin. When Cross smells drugs in a car (or, as Deputy Cowden describes it, when he "alerts" on a vehicle), he sits down. In this case, Cross alerted between the passenger-side front and back doors. Deputy Cowden searched the vehicle, and found

---

[3] The body camera footage begins at this time, when the requested backup arrives.
[4] Body camera time stamp: 05:57:40 – 05:57:53.

two burnt roach clips as well as a loaded Taurus 9 millimeter pistol. Deputy Cowden, who became visibly and audibly upset upon finding the weapon, placed Mr. Hefner in handcuffs.

The officers ran a felony check—which took "a while" because Sevier County's system was inoperable [*Id.*, p. 17, ll. 7-10]—and found out Mr. Hefner had pled guilty to second-degree burglary in South Dakota.[5]

### III. APPLICABLE LAW

Under the Fourth Amendment, a police officer must have probable cause to search a person's automobile. In this case, it is understood that once Cross sat down (indicating he detected drugs in the car) Deputy Cowden and the other officers had probable cause to conduct the search that led to the discovery of the gun. The issue is whether it was lawful for Deputy Cowden to bring Cross out in the first place.

To begin, Deputy Cowden needed a legal reason to approach Mr. Hefner's vehicle. The Government does not argue that Mr. Hefner committed a traffic infraction, so they effectively concede that Deputy Cowden did not have probable cause to initiate a traffic stop. Instead, the Government argues that Deputy Cowden was authorized to conduct a temporary involuntary detention, better known as a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968).

A two-step analysis is used to evaluate the constitutionality of a *Terry* stop. *U.S. v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). First, the court asks whether there was a proper basis for the stop, which is judged by examining whether the officer was aware of "specific and articulable" facts which give rise to "reasonable suspicion" of criminal activity. *Id.* If there was a proper basis, the court must then determine whether the degree of intrusion was reasonably related in scope to the situation at hand. *Id.* The overall analysis is made in light of the "totality of the circumstances."

---

[5] If true, this would satisfy the other element of the charge for being a felon in possession of a firearm. Mr. Hefner has moved to dismiss the Indictment on the basis that he had his rights restored [D. 30], but that is not at issue here.

*U.S. v. Williams*, 804 F. Supp. 2d 659, 662 (M.D. Tenn. 2011) (citing *U.S. v. Hensley*, 469 U.S. 221, 227 (1985)).

As to the first part, Deputy Cowden must have had a "reasonable, articulable suspicion" that Mr. Hefner "has been, is, or is about to be engaged in criminal activity[.]" *Id.*; *see also U.S. v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) ("Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the person of criminal activity"). The most frequently recurring factors considered in the Sixth Circuit include i) whether the suspect engaged in nervous or evasive behavior; ii) whether the suspect made furtive movements in response to police presence; iii) the speed of the suspect's movements; iv) whether the suspect was in a high-crime area; and v) the time of day the encounter occurred. *Williams*, 804 F. Supp. 2d at 662. But an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

The officer's knowledge of a defendant's prior criminal history is also a factor that may be considered, but as the Sixth Circuit has acknowledged, courts have ruled "in both directions" when evaluating the reasonableness of the officer's suspicion on this basis. *U.S. v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012). Suspicion on the basis of prior criminal history is given more weight if the history itself is specific and related to the suspicions the officer is developing (e.g., knowledge of prior drug crimes are more relevant if the officers suspects the defendant of possessing drugs). *Id.* But like many other factors considered, this factor cannot be dispositive: "Although a person with a criminal record could not be pulled over and detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." *Id.* (quoting *U.S. v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)).

The second step in the *Terry* analysis is the "degree of intrusion," which must be reasonably related in scope to the situation at hand. The particular intrusion at issue in this case is the use of the drug-sniffing dog.

Initially, it should be noted that the use of a well-trained narcotics dog, during a lawful traffic stop, does not generally implicate legitimate privacy interests. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). But a dog sniff is not an "ordinary incident of a traffic stop." *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1615 (2015). So the issue is not whether it was lawful for Deputy Cowden to use a drug-sniffing dog in general, but whether it was lawful to extend the stop so that Deputy Cowden could use a drug-sniffing dog in these circumstances.

The briefs discuss the relatively recent Supreme Court decision in *Rodriguez* at great length. *See Rodriguez*, 135 S.Ct. 1609. In that case, the suspect had veered into the highway shoulder (creating probable cause for a stop), and was lawfully pulled over. *Id.* at 1612. The officer checked license and registration, ran a records check, and issued a warning ticket. *Id.* at 1613. Even though the justification for the stop was "out of the way," the officer called in a drug-sniffing dog, who alerted to the vehicle. *Id.* Once the dog alerted, the officers searched the vehicle and found a large bag of methamphetamine. *Id.*

Both the district court and appellate court found that while there was not a reasonable basis to continue the stop, the motion to suppress should be denied because the time added to the stop was only a *de minimis* intrusion on the defendant's constitutional rights. *Id.* at 1613-14. The Supreme Court rejected this analysis, and held that, absent a finding of reasonable suspicion, an officer was not justified in detaining a suspect beyond completion of the investigation into the traffic infraction; thus, on remand, the motion to suppress should be granted if the court did not find reasonable suspicion to extend the stop. *Id.* at 1616.

So *Rodriguez* simply reinforces the principal question in this case: Did Deputy Cowden have reasonable suspicion to detain Mr. Hefner, both when the stop commenced and when he deployed his drug-sniffing dog?

IV. **DISCUSSION**

The discussion will proceed according to the two-part analysis used for *Terry* stops. First, the Court asks whether there was a proper basis for the stop of Mr. Hefner. If so, it must then determine whether the intrusion was reasonably related to the scope of the stop.

    a. **Step 1: Basis for Stop**

As discussed, the determination of whether an officer had reasonable suspicion requires an analysis of the "totality of the circumstances," and any individual factor will rarely be sufficient to create reasonable suspicion by itself. In this case, Deputy Cowden argues that a few circumstances, considered together, gave him a proper basis for the stop.[6]

The first consideration is the location of the car at a business, Floyd's Market, where drug activity was common. The time was 2 AM, and Floyd's was closed, yet a car was parked there with its headlights on.

Second is the known criminal history of the suspect, Mr. Hefner, whom Deputy Cowden recognized immediately. At the suppression hearing, Deputy Cowden testified that the two had "many dealings" over the years, and that Mr. Hefner had been accused of "violent crimes" and "drug activities" [D. 54, p. 7, ll. 23-25]. When pressed, Deputy Cowden gave one specific example—the "most recent" one—of Mr. Hefner's known behavior. In that incident, Mr. Hefner came up to a woman and presented himself as a bond agent. It is unclear how the situation escalated, but Mr. Hefner allegedly pointed a gun at her head, forced her to take methamphetamine, and did

---

[6] The "stop" (i.e., the point at which Deputy Cowden needs to show reasonable suspicion to justify a temporary detention) begins when Deputy Cowden asked Mr. Hefner to step out of the vehicle [*see* D. 54, p. 10, ll. 11-13].

several "sexual things" to her [*Id.*, p. 8, ll. 12-18]. Deputy Cowden has also responded to multiple domestic violence calls implicating Mr. Hefner, some of which involved guns.

The third relevant factor is the known history of the person Mr. Hefner planned to meet—Tabitha Gibbs. According to Deputy Cowden, Ms. Gibbs had "been in the system" numerous times for drug activity, and had a warrant out for her arrest that evening. The residence she was coming from was also "well-known." [*Id.*, l. 1]. Deputy Cowden did not elaborate on what exactly the residence was known for, but evidently Ms. Gibbs's father is the principal resident, and from context the Court can infer that Sevier County sheriff's deputies often visit the house in response to criminal activity occurring there.

Deputy Cowden's logic is clear: Mr. Hefner, who is known to engage in criminal (but not specifically drug-related) activity was suspiciously parked at a location known for drug-related activity. When Deputy Cowden asked Mr. Hefner why he was parked there, Mr. Hefner said he was planning to meet Ms. Gibbs, who is known to engage in drug-related activity. Further, Ms. Gibbs would be coming from a house that was known to facilitate criminal activity.

Considering all these circumstances, the Court finds that Deputy Cowden could reasonably infer that Mr. Hefner was parked in that location to participate in a drug transaction. Thus, there was a proper basis to initiate a temporary investigative detention, which satisfies the first of the two steps for the *Terry* analysis. The Court must now address whether the investigation Deputy Cowden undertook was reasonably related to the basis for the stop.

    **b. Step 2: Scope of Intrusion**

If Deputy Cowden had reason to suspect Mr. Hefner was about to engage in a drug transaction, his decision to deploy a drug-sniffing dog—which does not ordinarily implicate legitimate privacy interests—is clearly warranted. The question is whether Deputy Cowden deployed the dog

8

in a timely and non-intrusive manner, about two to three minutes after Mr. Hefner stepped out of the car [*see* Body Camera, 05:59:15].

There is no limit on the time a *Terry* stop may last—the inquiry is based instead on whether the officer used the "least intrusive means reasonably available" to dispel the officer's suspicion at the time. *U.S. v. Sharpe*, 470 U.S. 675, 693 (1985). Here, Deputy Cowden had reason to suspect drug activity, and he had a drug-sniffing dog in his car, which was trained to quickly confirm or deny his suspicion that Mr. Hefner was about to engage in a drug transaction without implicating Mr. Hefner's legitimate privacy interests. No evidence indicates that Deputy Cowden extended the stop longer than necessary prior to deploying the dog, and his suspicions were confirmed once Cross alerted on the passenger side.

At that point, Deputy Cowden developed probable cause to search the vehicle. Because the suspicion to initiate the stop still existed when the dog was deployed, and because the investigation was undertaken by the least intrusive means available, the Court finds the search was lawful.

## V.     CONCLUSION

Accordingly, Mr. Hefner's objection [D. 46] is **OVERRULED**, and the Court **ACCEPTS IN WHOLE** the Report and Recommendation of Judge Poplin [D. 43]. Mr. Hefner's motion to suppress [D. 32] is hereby **DENIED**.

**IT IS SO ORDERED.**

*/s/ Pamela L. Reeves*
**CHIEF UNITED STATES DISTRICT JUDGE**